**UNITED STATES of America,
Plaintiff-Appellant,**

v.

**INTERNATIONAL HARVESTER
COMPANY and Steiger Tractor,
Inc., Defendants-Appellees.**

No. 77–1191.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 19, 1977.

Decided Nov. 4, 1977.

Rehearing and Rehearing En Banc
Denied Feb. 17, 1978.

Carl D. Lawson, Susan J. Atkinson, Attys., Dept. of Justice, Washington, D. C., for plaintiff-appellant.

Glenn W. McGee, William R. Jentes, Chicago, Ill., for defendants-appellees.

Before CUMMINGS, Circuit Judge, KUNZIG, Judge of the United States Court of Claims,* and BAUER, Circuit Judge.

CUMMINGS, Circuit Judge.

In March 1975, the Government filed this civil action alleging that International Harvester Company's purchase of a 39% stock interest in Steiger Tractor, Inc. violated Section 7 of the Clayton Act (15 U.S.C. § 18), the so-called anti-merger statute.[1] The salient parts of the complaint, whose factual statements are largely uncontested, may be summarized as follows:

In recent years there has been an increased demand for high-powered and four-wheel drive farm tractors, the latter being the most powerful sold. In 1973, 22,300 high-powered farm tractors were sold or leased for $321,000,000 and 6400 four-wheel drive tractors were sold or leased for $112,-000,000.

Harvester is a world-wide manufacturer of agricultural, industrial and construction equipment and over-the-road trucks. In 1973, its sales totaled $4.2 billion, and its assets were $2.8 billion. It was then the

---

* The Honorable Robert L. Kunzig is sitting by designation.

1. Section 7 of the Clayton Act provides in pertinent part:

   "No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."

22nd largest industrial corporation in the United States, and it is the second largest producer of agricultural machinery and equipment in this country. It is also the nation's second largest manufacturer of wheeled farm tractors, and in 1973, its sales of high-powered farm tractors amounted to $88 million.

Steiger was incorporated in 1969 and specializes in the manufacture and sale of four-wheel drive farm tractors. Its sales increased from $1.4 million in 1969 to $35.5 million in fiscal 1974. In addition to marketing tractors through 236 dealers, it manufactures four-wheel drive tractors for Harvester, Allis-Chalmers Corporation and Canadian Co-Operative Implements, Ltd. (CCIL).

In 1973, Steiger's shipment of all high-powered farm tractors accounted for 5 per cent of the national market, and the shipments of Harvester, one of Steiger's competitors accounted for 28 per cent of that market. Steiger was fourth and Harvester was second among the ten shippers of such tractors in this country. As to four-wheel drive farm tractors, Steiger's shipments were 14 per cent and Harvester's 8 per cent of the industry, with Steiger ranking third and Harvester sixth among the ten shippers of such tractors in the United States.

In 1973, Steiger produced for itself and others four-wheel drive tractors that represented 19 per cent of industry shipments of such tractors, whereas Harvester's production accounted for 6 per cent. As to all high-powered farm tractors in 1973, Steiger produced 7 per cent and Harvester 27 per cent. In that year, the top four firms shipping high-powered farm tractors accounted for 83 per cent of industry shipments whereas the top four firms shipping four-wheel drive farm tractors accounted for 73 per cent of industry shipments of such tractors.

The Government also alleged that on February 28, 1974, the two defendants entered into a Stock Purchase Agreement and a Manufacturing Agreement.[2] Pursuant to the former agreement, Harvester acquired 39 per cent of Steiger's common stock on May 1, 1974. The Stock Purchase Agreement gave Harvester the right to place three directors on Steiger's nine-man Board of Directors. The Manufacturing Agreement extends to October 31, 1979 (with automatic renewals until prior notice of cancellation) and provides that Steiger will assemble for Harvester four-wheel drive tractors using certain components supplied by Harvester, that Harvester will purchase certain minimum amounts of such tractors, and that Steiger will make available to Harvester a maximum of 48–52 per cent of Steiger's annual production.

Steiger's four-wheel drive farm tractors are manufactured in North Dakota and Harvester's high-powered two- and four-wheel drive farm tractors are manufactured in Illinois.

The Government charged that the effect of the Stock Purchase Agreement and Harvester's acquisition of 39 per cent of Steiger's common stock "may be substantially to lessen competition or to tend to create a monopoly in * * * interstate trade and commerce" in violation of Section 7 of the Clayton Act (note 1, *supra*) in the following three respects:

1. Elimination of actual and potential competition between Harvester and Steiger in the production and sale of high-powered and four-wheel drive farm tractors.

2. Substantial increase in concentration of production and sale of such machines.

3. Possible substantial lessening of competition in production and sale of such machines.

Consequently the Government requested the district court to order Harvester to divest itself of all Steiger stock and to cancel the Stock Purchase Agreement. The Government also sought to enjoin Harvester "for a period of years" from acquiring stock or assets of any concern engaged in the production or sale of tractors.

---

**2.** These agreements were executed on April 16, 1974.

Both defendants filed answers to the complaint in May 1975 asserting, *inter alia,* that high-powered farm tractors were not the relevant line of commerce or market.[3] In Steiger's answer, it asserted that the Stock Purchase and Manufacturing Agreements between it and Harvester were entered into by Steiger to overcome serious financial problems and that they assured Steiger of new production facilities and a ready outlet for increased output, thus promoting and increasing competition in the production and sale of tractors.

After the completion of extensive discovery, the five-day trial commenced in June 1976. Fortunately for both courts, the parties agreed on the relevant lines of commerce and geographic market. Thus on the second trial day counsel stipulated that the sale and production of four-wheel drive farm tractors are relevant lines of commerce and that the United States is the relevant geographic market. They also stipulated that while articulated and rigid frame four-wheel drive tractors compete with each other in most agricultural applications, most four-wheel drive tractors sold in the United States are of an articulated design.[4] The parties also agreed that in recent years there has been an increased demand for high-powered farm tractors and four-wheel drive farm tractors. Almost all of the latter sold in this country have 140 or more horsepower.

The stipulation also showed that Harvester produces and sells a single rigid frame four-wheel drive tractor and sells two models of articulated four-wheel drive tractors manufactured by Steiger, which specializes in manufacturing and selling four-wheel drive farm tractors. According to the stipulation:

"Steiger produces a line of five articulated four-wheel drive tractors for agricultural use and three models adapted for construction use, under the Steiger name, and markets them through approximately 236 dealers in the United States. It also manufactures and assembles for IH [Harvester] two jointly-engineered four-wheel drive farm tractors which use major IH components." (III Joint Appendix 815.)

At the close of the Government's case, the defendants moved to dismiss the action, but their motion was denied after argument. Defendants then put in their evidence, followed by rebuttal evidence from the Government. About seven weeks thereafter, following consideration of trial testimony, admissions in dispositions, 443 exhibits and the above stipulation, the district court entered 78 findings of fact and five conclusions of law in defendants' favor and also entered final judgment for defendants. However, by stipulation of the parties, the time for the Government to appeal was stayed until the court could prepare a supporting memorandum opinion. On February 28, 1977, that memorandum opinion was filed, and final judgment was simultaneously entered in defendants' favor.

Of the district court's 78 findings of fact, the Government attacks only two as clearly erroneous.[5] Instead, the Government's "principal contention" on appeal is that "the court did not apply the correct legal standard and consequently based its ultimate conclusion of law on findings that are either legally insufficient or irrelevant" (Reply Br. 2). The Government further argues that "the elimination of even a small force [Steiger] by a significant competitor [Harvester] is presumptively unlawful" (Reply Br. 6), and that the defendants' evidence does not rebut that presumption. In our view, the district court's voluminous findings of fact fully support the conclusion that Section 7 was not violated, and those findings are not clearly erroneous. Therefore, we affirm.

---

3. The Government subsequently so agreed, for a stipulation described *infra* provided that four-wheel drive farm tractors are the relevant line of commerce.

4. In articulated tractors the front portion of the frame is hinged to the rear portion.

5. Findings 33 and 56 are said to be clearly erroneous in part (Br. 24–25 and 39 n. 28) and are discussed *infra.*

*I. The Legal Sufficiency of the Evidence*

The Government's main criticism of the district court's approach is that the court's opinion supposedly does not recognize that existing Supreme Court precedent "creates a presumption that a substantial lessening of competition will result from the combination of two leading competitors in a highly concentrated market" (Reply Br. 2). Even assuming that Harvester's acquisition of 39 per cent of Steiger's stock fits within the merger cases that the Government cites as establishing this inference (*United States v. Philadelphia National Bank,* 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915; *United States v. Alcoa,* 377 U.S. 271, 84 S.Ct. 1283, 12 L.Ed.2d 314, and *United States v. Continental Can Co.,* 378 U.S. 441, 84 S.Ct. 1738, 12 L.Ed.2d 953), there is no need to fault the district court for not using the term "presumption," for its refusal to dismiss the action at the close of the Government's presentation meant that in its view the Government had presented a *prima facie* case and that the acquisition therefore was presumptively illegal. See *United States v. Marine Bancorporation,* 418 U.S. 602, 631, 94 S.Ct. 2856, 41 L.Ed.2d 978.

To the extent that the Government's criticism is aimed instead at the type of evidence used by the district court to overcome this presumption, we disagree. In responding to a statistical showing of concentration and in concluding that Section 7 was not violated, Judge Leighton properly considered evidence of Steiger's "weakness as a competitor." *United States v. General Dynamics,* 415 U.S. 486, 503, 94 S.Ct. 1186, 39 L.Ed.2d 530. In fact, characterized in either one of two ways, this evidence is precisely the kind of information into which the Supreme Court in recent cases has mandated an inquiry. See *United States v. Citizens & Southern National Bank,* 422 U.S. 86, 120, 95 S.Ct. 2099, 45 L.Ed.2d 41; *United States v. Marine Bancorporation, supra,* at 631, 94 S.Ct. 2856; *United States v. General Dynamics, supra,* at 497–498, 94 S.Ct. 1186; *Brown Shoe Co. v. United States,* 370 U.S. 294, 322 n. 38, 82 S.Ct. 1502, 8 L.Ed.2d 510. First, the evidence can be viewed as a showing that "the market-share statistics gave an inaccurate account of the acquisitions' probable effects on competition." *United States v. Citizens & Southern National Bank, supra,* at 120, 95 S.Ct. at 2118, citing *United States v. General Dynamics, supra,* at 497–98, 94 S.Ct. 1186. This showing, which has been called the *"General Dynamics* defense,"[6] establishes that the Government's past market statistics are really insufficient to constitute a *prima facie* case because Steiger's weak financial reserves (like United Electric's weak coal reserves in *General Dynamics*) would not allow it to be as strong a competitor as the bald statistical projections indicate.[7] Second, the evidence is appropriate to the related proposition that even accepting the statistics as the primary index of market power, "only a further exam-

---

**6.** See, *e. g., United States v. Amax,* 402 F.Supp. 956, 970 (D.Conn.1975).

**7.** Although the Government asserts that *General Dynamics* is distinguishable on the facts (Br. 22 n. 20, Reply Br. 11 n. 9), the rationale of that case was not limited to situations involving limited amounts of a natural resource, such as the coal reserves at issue there. On the contrary, in a rapidly expanding industry in which plant expansion and an ability to keep pace with demand are, as Judge Leighton concluded, "needed * * * to take advantage of the growing * * * market" (finding 33), current sales and production, taken apart from the availability of capital, are no less "unreliable indicators of actual market behavior," *United States v. Marine Bancorporation, supra,* at 631, 94 S.Ct. at 2875, than production was in *General Dynamics* when taken apart from coal re-serves. Moreover, the type of evidence that the Supreme Court itself has considered after *General Dynamics* (see *United States v. Citizens & Southern National Bank, supra,* at 121, 95 S.Ct. 2099; *United States v. Marine Bancorporation, supra,* at 631–632, 94 S.Ct. at 2874–2875) indicates that the *"General Dynamics* defense" is not to be limited to the absence of resources, either natural or monetary, but rather should include, at least as the Government admits elsewhere in its brief, those "special circumstances" in the case that indicate that the "statistical data did not provide a reliable indication of the future effect of the acquisition" (Br. 19 n. 18), or perhaps even more broadly, any evidence indicating that statistical projections may be unreliable, cf. *United States v. Amax, supra,* 402 F.Supp. at 970.

ination of the particular market—its structure, history and probable future—can provide the appropriate setting for judging the probable anticompetitive effect of the merger." *Brown Shoe v. United States, supra,* at 322 n. 38, 82 S.Ct. at 1522, quoted in *United States v. General Dynamics, supra,* at 498, 94 S.Ct. 1186. Viewed in this light and focused more directly on the ultimate conclusion, the *prima facie* case presented by the Government was rebutted by persuasive evidence, including Steiger's weakened financial condition, indicating that "no substantial lessening of competition occurred or was threatened." 415 U.S. at 498, 94 S.Ct. at 1194.[8] Thus even though the defendants do not rely on the failing-company doctrine, which is a valid defense to a Section 7 suit,[9] they have shown that even if Steiger remained in the market, it did not have sufficient resources to compete effectively, and this supports the district court's conclusion that the acquisition of 39 per cent of Steiger's stock by Harvester would not substantially lessen competition. See 415 U.S. at 508, 509–510, 94 S.Ct. 1186.

With two exceptions (note 5 *supra*), the Government does not attack the district court's findings as clearly erroneous (Reply Br. 1), and all parties have agreed on the relevant line of commerce and geographic market. Therefore, this part of the opinion will advert to the findings that support the conclusion that the effect of this acquisition will probably[10] not substantially lessen competition or tend to create a monopoly in the manufacture and sale of four-wheel drive farm tractors.

## A. *Steiger's Critical Position Before the Acquisition*

As Judge Leighton found, in 1973 Harvester produced and sold a single model rigid frame four-wheel drive tractor and sold an articulated model four-wheel drive tractor manufactured by Steiger, with Harvester's total sales of high-powered farm tractors being $88 million.[11] In 1975, its retail sales of four-wheel drive tractors amounted to $29,577,000 (82.8 per cent being articulated models) for 1,079 units (79.2 per cent being articulated models). Harvester's share of total four-wheel drive tractor production in units dropped from 6.9 per cent in 1973 to 2.1 per cent in 1975, but its share of four-wheel drive tractor sales in units rose from 8.4 per cent to 10.2 per cent during that period.

Based on the stipulation, the court also found that Steiger produced five articulated four-wheel drive tractors for agricultural use and three models for construction use under its name, marketing them through 236 dealers.

The court also found that Steiger's financial condition was "very precarious" in 1970, resulting in its suppliers' refusing to ship it parts and components. Its net loss in 1970

---

8. While agreeing that evidence fitting the first of the above characterizations can be considered (Br. 19 n. 18, Reply Br. 2), the Government attempts to limit the district court's options by arguing that the *prima facie* case of illegality may be overcome only by such evidence (Reply Br. 2). Thus apparently because Judge Leighton applied the second of the above characterizations to describe evidence that could fit within either one, the Government rejects the district court's evidence as irrelevant. Even assuming that there are significant legal and practical distinctions between the two characterizations and that, as the Government contends, only the first type of evidence can be considered, we do not agree that Judge Leighton made all of his findings irrelevant simply by calling them by a different name. Although the Government correctly notes that the district court did not explicitly state "that Steiger's market share did not adequately predict its future competitive strength" (Reply Br. 12), we

do not regard the court's nomenclature as determinative and instead find such a prediction was clearly implied by findings such as that Steiger "could not withstand any economic adversities," that "it was at a competitive disadvantage," and that, significantly, "it was faced with a situation where its facilities had to be improved if it was to take advantage of the growing four-wheel drive tractor market."

9. *Brown Shoe Co. v. United States, supra,* at 346, 82 S.Ct. 1502.

10. Probability is the guideline for measuring a Section 7 violation. *Brown Show Co. v. United States, supra,* at 323, 82 S.Ct. 1502.

11. At the oral argument, we were advised that Harvester never manufactured articulated models.

was $525,971, with working capital of $82,-755 and only $4,914 in cash to meet current liabilities of $1,111,841.

In May 1971, Steiger received a contract to produce five tractors per month for CCIL. Because of this contract and CCIL's credit strength, Steiger obtained financing from the Merchants National Bank of Fargo, North Dakota, secured by an assignment of accounts receivable of CCIL and the personal endorsement of Eugene Dahl, Steiger's current chairman and chief executive officer.

In August 1971, Merchants National Bank told Steiger that it could extend no further credit and that Steiger needed substantial additional equity in order to continue to grow. Therefore, Steiger persuaded a small business investment firm, Chase Manhattan Capital Corporation, to lend it $750,-000. In late November 1971, it received a contract to produce 60 tractors for Allis-Chalmers Corporation and accordingly was able to secure additional funds from Merchants National, "but only when secured by a financing statement and security interest in inventory and accounts receivable and the personal endorsement of Mr. Dahl."

By December 31, 1971, Steiger's financial situation was still precarious, for its losses had increased to $825,922 and its current liabilities of $4,338,613 exceeded its current assets of $3,881,971. Its working capital had been reduced to a negative $456,642 in 1971, and shareholders' equity had been reduced to a negative $334,296.

Steiger's financial situation remained equally bleak through 1972. Early in that year Merchants National Bank notified Steiger that its extension of credit was at an end, and Chicago banks were unwilling to provide financial assistance. In mid-February 1972, Chase Manhattan Capital called its outstanding $750,000 loan. Although Steiger contracted with Harvester

to produce a prototype tractor in May 1972, Merchants National Bank recommended that Steiger sell the business and "get out before [they] go into worse debt." Steiger then borrowed $250,000 from customer Allis-Chalmers in September 1972 and $200,-000 from customer CCIL in October 1972.

In 1972, Steiger changed its accounting system to a fiscal year ending September 30. For the nine months ending September 30, 1972, its financial statement showed a net loss of $342,000, while current liabilities of $5,183,000 exceeded current assets of $4,431,000. Steiger had a deficit working capital of $752,000, and shareholders' equity was a negative $757,000.

Because of its critical financial condition, at the beginning of fiscal 1973 Steiger was forced to seek financing on a factored basis with James Talcott, Inc. That commercial credit firm gave Steiger a line of credit up to $1.5 million, but at 11¼ per cent interest, whereas the prime lending rate was 5¾ per cent. Talcott demanded extensive collateral and required Steiger to desist from certain corporate activities without Talcott's consent.

Even with Talcott's line of credit, Steiger remained short of funds. Thus during the first three months of 1973, it was consistently overdrawn at Merchants National Bank by as much as $250,000 and in April by over $500,000, forcing it to seek additional funds from Talcott. That firm agreed to increase Steiger's line of credit to $3 million but at 15½ per cent interest and on other rigorous conditions. While Steiger's condition improved at the close of its fiscal year 1973, showing net worth of $131,000 and net income of $1,000,566 (with $480,000 of this resulting from loss carry-forwards from prior years),[12] the court found that its condition was still far worse than any of the other seven firms in the industry with

---

12. Although the Government views this evidence as proof that the acquisition was no longer necessary because Steiger's "fortunes [had] turned" (Br. 6), we cannot agree. If Steiger had claimed to be a failing firm, about to go out of business due to a disastrous profit picture, such evidence might have been persuasive, but the essence of Steiger's defense instead went to the availability of capital and, as the district court's findings indicate, that availability was not significantly improved after the company showed a profit at the close of fiscal 1973.

available figures. At year-end 1973, Steiger was still in a position "where it could not withstand any economic adversities." From a financial point of view, at the end of 1973, Steiger's financial condition placed it at a competitive disadvantage not only with respect to the major manufacturers in the industry but also with Versatile Manufacturing Company, one of its strongest competitors and a company approximately its own size.[13]

### B. The Agreements Between Harvester and Steiger

At the end of fiscal 1973, Steiger was in urgent need of added financing and improved facilities in order to take advantage of the growing four-wheel drive tractor market. To secure needed equity capital, commencing in 1971 Steiger had unsuccessfully attempted to obtain additional capital investment in the company through private and public offerings of its stock. Allis-Chalmers, for example, rejected Steiger's offer of 20 per cent of the company for $1 million. By the fall of 1973, Steiger concluded that "the only practicable source of sufficient amounts of equity financing to solve its pressing needs" was to interest Harvester in an equity investment in Steiger. Therefore at that time Steiger commenced discussions to that end with Harvester. Harvester was interested because it wished to purchase more articulated four-wheel drive tractors from Steiger and realized that Steiger could not supply them unless it secured added capital and increased its production facilities. Harvester wished to purchase 750 such tractors from Steiger per year instead of an average of 308 per year as formerly.[14]

Steiger rejected Harvester's proffer of purchasing all its stock over a period of time. In February 1974, the defendants were in substantial agreement on the terms of a proposed Steiger stock purchase. On April 16, 1974, they entered into a Stock Purchase Agreement and a Manufacturing Agreement, both dated February 28, 1974. Under the Stock Purchase Agreement, Harvester agreed to acquire 39 per cent (or one million shares) of Steiger's common stock for $5 a share. As a condition precedent to that agreement, at Steiger's request, defendants simultaneously executed a five-year Manufacturing Agreement so that Steiger could build a needed facility and be able to produce more tractors for Harvester and others. The stock acquisition was consummated about May 1, 1974. By February 1, 1976, Harvester's ownership was reduced to 36 per cent and will be reduced to 33⅓ per cent.

Under the Stock Purchase Agreement, Harvester was to name three out of Steiger's nine directors, and three Harvester executives were elected to Steiger's Board of Directors on May 17, 1974. The Stock Purchase Agreement also provided that Steiger could make nine prescribed moves (such as merger, corporate acquisition, liquidation) only with a vote of seven of its nine directors. This provision was deleted on August 19, 1976 (Govt. Br. 12 n. 15).

The Manufacturing Agreement is to remain in force until October 31, 1979, and provides for optional extensions on a year-to-year basis. The agreement provides that Steiger assemble Harvester designed and engineered four-wheel drive articulated frame tractors, with Harvester's trademark. As to such tractors, Harvester is to supply the major components. Harvester was required to purchase at least 708 such tractors for the year following November 1, 1973, escalating to 2626 tractors in 1979. How-

---

**13.** Because of this weakened financial condition, we do not agree with the Government that Steiger's leadership in design made it a "pioneer" that deserved special scrutiny, such as Rome Cable in *United States v. Alcoa,* 377 U.S. 271, 84 S.Ct. 1283, 12 L.Ed.2d 314. Unlike Rome Cable, which was described by the Supreme Court as one of Alcoa's "significant competitors," *id.* at 280, Steiger was found by the district court to be at a "competitive disadvantage not only with respect to the major manufacturers in the industry" but also with a company "approximately its own size."

**14.** Under a 1972 contract with Harvester, Steiger was to produce 925 such tractors over a three-year period for Harvester: 225 the first year, 325 the second and 375 the third.

ever, Harvester could not require Steiger to sell it more than 48 per cent of Steiger's production in 1975, 49 per cent in 1976, 50 per cent in 1977, and 52 per cent in 1978 and 1979. Harvester retained the right to establish its retail and wholesale prices on such units.[15]

### C. The Impact of the Acquisition on the Market

#### 1. The position of Steiger and Harvester

The district court also found that both agreements "substantially improved Steiger's financial, operating and competitive position in the four-wheel drive tractor market." Steiger was thus able to eliminate its prior burdensome, high-interest commercial loans and to secure needed normal bank financing through mortgage loans to construct a new plant. The court also found that

"according to knowledgeable industry witnesses, and other evidence, the Harvester-Steiger relationship has significantly contributed to Steiger's role as an expanding, independent competitor in four-wheel drive tractor manufacturing and sales, and there is every reason to believe this situation will continue in the future."

As a result of the two agreements, Steiger retired the costly Talcott financing and was able to secure lines of credit from banks in Chicago and Omaha. Steiger's net worth and working capital increased dramatically, and its debt-to-equity ratio changed from 79 to 1 to 2.4 to 1, normal for the industry. Construction of Steiger's new plant enabled it to enter foreign markets, to produce more of its own parts, and to raise its production capacity from 2,000 units in 1973 to 12,000 units currently to meet the growing demand for articulated four-wheel drive tractors.

The court also found that Harvester has not controlled Steiger's business activities, in accordance with a "clear understanding between the two corporations that Harvester had no intent nor was it to seek control of Steiger through the stock acquisition." Indeed the Stock Purchase Agreement expressly stated this intent, and Harvester has waived two provisions in the Stock Purchase Agreement by which it could acquire additional Steiger stock (Govt. Br. 12–13 n. 15). The three Harvester directors on Steiger's board have obtained only standard financial data from Steiger and other information which was available from other sources. Through their directorships they have not obtained "competitively sensitive inside information" from Steiger.

Judge Leighton found too that Steiger's competitive position was not affected by the provision in the Stock Purchase Agreement requiring the vote of seven of its nine directors for nine major corporate acts because (1) the provision has never been invoked, (2) if necessary, Harvester plans to waive the provision in connection with Steiger's contemplated stock offering, and (3) the provision is similar to one contained in Steiger's loan agreement at the insistence of its lenders. This provision was subsequently waived by Harvester (Govt. Br. 12 n. 15).

The Stock Purchase Agreement provides that Harvester shall not limit Steiger's continuance of its contractual obligations to produce articulated farm tractors for Allis-Chalmers Corporation and CCIL, and Steiger has renewed those agreements. The Stock Purchase Agreement also provides that Harvester may not prevent Steiger from undertaking financially sound business activities. Harvester has not interfered with Steiger's manufacturing or sales efforts in the past, and the court found that there is no likelihood that Harvester will do so.

---

**15.** The contract does not require Harvester to take all its requirements of articulated four-wheel drive tractors from Steiger, and the Government does not contend that it hurts

Steiger's competitors. At oral argument, we were advised that Steiger sells only 30 per cent of its production of these tractors to Harvester.

Harvester's overseas department advised Steiger how to enter into a better contract to sell tractors to a Hungarian corporation, and "Harvester has not restricted Steiger's marketing plans or sought to effect [sic] Steiger's sales of tractors to its dealers."

The relationship with Harvester has enabled Steiger to increase its production from 1,003 units in 1973 to 2,364 units in 1975 and to increase its share of four-wheel drive tractor production from 15.9 per cent to 22.4 per cent, moving Steiger into second place in the production of such tractors.

As the court found, the two agreements between Harvester and Steiger substantially strengthened Steiger "as an aggressive, independent factor for the four-wheel drive tractor industry" while competition between the two "remains intense." In the tractors it makes for Harvester employing its design, Steiger uses 50 per cent Harvester components, with both companies actively vying for the same customers and with "active price competition" between defendants. Because of these agreements, Steiger is expected to expand further.

Harvester was motivated in acquiring Steiger stock to avoid a several-year hiatus while developing its own manufacturing facilities for articulated four-wheel drive tractors. At the time of the acquisition, Harvester did not have the capability to meet its dealers' increased demand for four-wheel drive tractors nor any expertise with articulated models.

Through the relationship with Steiger, Harvester has increased its market share in sales of four-wheel drive tractors (in units) from 8.4 per cent in 1973 to 10.2 per cent in 1975. Competition in the four-wheel drive tractor market has been strengthened through these agreements by expanding Steiger's competitive role and to a lesser extent Harvester's. Steiger's improved financial situation and the larger production facilities allowed it to expand its sale of four-wheel drive tractors to CCIL and to Allis-Chalmers until Allis-Chalmers could commence manufacturing such machines in 1976.

2. The position of the industry as a whole

The evidence before the district court caused it to find that since 1973 competitive activity in the four-wheel drive tractor industry has increased markedly, with that industry "going to be even more fiercely competitive than it has been." Other companies have also expanded in their manufacture and sale of four-wheel drive tractors, while there has also been some decline in concentration of the market in terms of units sold by the four largest firms—specifically a 2.7 per cent decline from 74 per cent in 1973 to 71.3 per cent in 1975. Without Harvester's infusion of capital, the full-line tractor manufacturers "would [likely] have taken over a much larger market share, thus increasing concentration in the production of four-wheel drive tractors." Between 1973 and 1975, there have been marked shifts in the relative rankings of the companies within the four-wheel drive tractor industry, tending to show the intensity of competition among firms as they vie for market position.

Since Harvester acquired Steiger stock, there has been active product competition in the four-wheel drive tractor market, with various companies producing new models and with "intensified price competition." From the evidence before him, the district judge found there was "no reason to believe that the intensely competitive situation which presently exists in the relevant four-wheel drive tractor market will diminish in the future." On the contrary, he found that there was "every indication that the high level of competition will continue," with two other firms already entering the industry and five more planning to do so.

Both Government and defendants' witnesses testified about the intensification in competition since Harvester's acquisition of Steiger stock, with no likelihood of change in that situation. As a result, Steiger and Harvester have become "stronger competitors in the four-wheel drive tractor market."

Based on the stipulation between the parties and the foregoing findings, the court

held that the relevant geographic market or section of the country is the United States and that the manufacture *and* sale of four-wheel drive farm tractors "are relevant product markets or lines of commerce" within the meaning of Section 7 of the Clayton Act (note 2, *supra*). Since the court concluded that the record established that the acquisition of Steiger stock by Harvester and the manufacturing agreement between defendants "have led, and will likely continue to lead, to a significant increase in competition in the relevant markets," judgment was entered for defendants.

## II. *The Disputed Findings of Fact*

■ Under standards adopted by the Supreme Court under this statute, the district court's 78 findings of fact, if not clearly erroneous, abundantly support its conclusion that Section 7 of the Clayton Act was not violated by defendants. See *Brown Shoe Co. v. United States,* 370 U.S. 294, 319–322, 335, 82 S.Ct. 1502, 8 L.Ed.2d 510; *United States v. Citizens & Southern National Bank,* 422 U.S. 86, 120–122, 95 S.Ct. 2099, 45 L.Ed.2d 41; *United States v. General Dynamics Corp.,* 415 U.S. 486, 489–490, 494, 498, 505, 508, 510–511, 94 S.Ct. 1186, 39 L.Ed.2d 530. Of these findings of fact, the Government attacks only two as clearly erroneous in part. Finding 33 ends as follows:

> "In the Fall of 1973, Steiger approached Harvester which expressed an interest in an equity investment in the company, an expression which Steiger reasonably concluded was the only practicable source of sufficient amounts of equity financing to solve its pressing needs."

The Government's brief attacks this finding in the alternative, contending that if the finding is interpreted as meaning that Harvester's offer was the *only* means of providing necessary financing to Steiger, it is clearly erroneous, and if it is read as holding that Harvester's offer was Steiger's *best* opportunity, it reflects legal error (Br.

24–26). However, a like argument that a defendant such as Steiger, which rebuts the Government's *prima facie* case by citing limited financial resources, must show that Harvester "was the only available acquiring company," was presented to the Court and rejected in *United States v. General Dynamics, supra,* at 507, 94 S.Ct. at 1198. In that case Justice Stewart's answer was that "[t]hese considerations would be significant if the District Court had found no violation of § 7 by reason of United Electric's being a failing company, but the District Court's conclusion was not, as the Government suggests, identical with or even analogous to such a finding." *Id.* Thus the district court in this case, by concluding that Harvester was reasonably regarded as the *only practicable* source, came much closer to the finding that the Government insists is required than did the district court in *General Dynamics,* and therefore certainly did not commit legal error. The Government's briefs do not dispute that Harvester was the "only practicable source" of funds, and that finding was fully supported by evidence showing the onerous options otherwise available to Steiger.

■ The second finding assailed as clearly erroneous is that portion of finding 56 providing:

> "Harvester employees who act as directors of Steiger have not obtained competitively sensitive inside information *by virtue of their positions on the Steiger board.*" (Emphasis supplied.)

The Government asserts that if the court's finding excludes the emphasized phrase, it is clearly erroneous (Br. 39, n. 28). First of all, the finding does contain the language that the Government conveniently would seek to excise, and even if it did not or if a finding without the emphasized phrase were legally required, one of Harvester's three directors on Steiger's board testified that he did not see any confidential information but only normal financial figures that were reviewed before being announced to the public. Moreover, while the Govern-

ment refers to certain data that goes to Harvester in connection with the manufacturing contract between the defendants (Br. 38–39), similar data goes to other companies with which Steiger has supply arrangements (I Joint Appendix 55–56). Therefore, it is clear that neither of these findings was clearly erroneous.

In deciding whether this acquisition violated the anti-merger law, Judge Leighton considered "among other things, the number and power of competitors in the relevant markets [production *and* sale of four-wheel drive farm tractors in the United States]; the background of the growth and the resources of the corporations involved; the relationship of their lines of commerce; [and] the physical, economic and legal barriers preventing the entry of other potential competitors into the industry" (mem. op. 10). He did not overemphasize post-acquisition evidence because much of it was beyond the power of the parties to manipulate and because it was only part of the overall scene depicted in the 78 findings. His memorandum opinion shows that the district court was well aware of the leading cases under Section 7 of the Clayton Act and properly applied the rules they established before concluding that this acquisition does not violate that statute. Because the rationale of the opinion accords with *United States v. General Dynamics Corp.,* 415 U.S. 486, 94 S.Ct. 1186, 39 L.Ed.2d 530, and because the findings are sufficient to overcome the Government's *prima facie* case, the judgment is affirmed.