597 F.2d 814
 1979-1 Trade Cases 62,573
 The F. & M. SCHAEFER CORPORATION and the F. & M. Schaefer
Brewing Co., Plaintiffs-Appellees,
v.
C. SCHMIDT & SONS, INC. and Citibank, N.A., as Successor
Trustee under Four Trust Agreements each dated
December 28, 1944, made by Rudolph J.
Schaefer, as Settlor,
Defendants-Appellants.
 Nos. 683, 736, Dockets 78-7621, 78-7648.
 United States Court of Appeals,
Second Circuit.
 Argued March 5, 1979.
Decided April 3, 1979.
 
 Patrick W. Kittredge, Philadelphia, Pa. (Alan M. Lerner, Joseph M. Donley, Cohen, Shapiro, Polisher, Shiekman & Cohen, Philadelphia, Pa., Arthur M. Handler, Leonard W. Wagman, Manuel W. Gottlieb, Vicki Z. Armet, Curtis V. Trinko, Golenbock & Barell, New York City, of counsel), for defendant-appellant C. Schmidt & Sons, Inc.
 William B. Pennell, New York City (R. Bruce MacWhorter, Richard P. Lasko, Shearman & Sterling, New York City, of counsel), for defendant-appellant Citibank, N.A.
 William R. Glendon, New York City (Guy C. Quinlan, William S. Greenawalt, James J. Maloney, Peter M. Dugre, Rogers & Wells, New York City, of counsel), for plaintiffs-appellees.
 Before FRIENDLY, SMITH and MANSFIELD, Circuit Judges.
 PER CURIAM:
 
 
 1
 C. Schmidt & Sons, Inc. and Citibank, N.A., appeal a decision of Judge Broderick granting appellees F. & M. Schaefer Corp. and F. & M. Schaefer Brewing Co. (collectively "Schaefer")[1] preliminary relief enjoining appellants from executing an agreement entered into by them on April 3, 1978, for the purchase by Schmidt for $6 million[2] from a trust administered by Citibank of subordinated, convertible notes issued by F. & M. Schaefer Corp. in the face amount of $20 million, due January 15, 1998. The notes are convertible into 769,232 shares of Schaefer common stock, or approximately 29% Of its outstanding shares after conversion.[3] Schaefer is a publicly held company, and the 29% Block would represent the largest single holding. It is undisputed that Schmidt would convert the notes if it were allowed to purchase them, but there is some dispute whether Schmidt would thereby obtain control of Schaefer.
 
 
 2
 Schmidt and Schaefer are direct competitors; both market various brands of "regional" beers selling at "popular" prices, meaning that they sell primarily within one region of the country and at a price below that of the "premium" labels marketed by the national brewers (e. g., Anheuser-Busch, Inc., Miller Brewing Co., Jos. Schlitz Brewing Co.). Schmidt and Schaefer market largely within the 12-state northeastern region of the United States. A large share of their sales, however, is concentrated in the New York City and Philadelphia metropolitan areas, which in 1977 accounted for about 34% Of Schaefer's total sales and 28% Of Schmidt's total sales. Price competition between the two is vigorous and represents a major factor affecting each company's sales and profits.
 
 
 3
 Upon learning of Citibank's proposed sale of the notes to Schmidt, Schaefer sued to prevent the sale, claiming that it would violate §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2 and § 7 of the Clayton Act, 15 U.S.C. § 18, and moved for a preliminary injunction. After a hearing lasting six weeks, the trial court found that Schaefer and the public would possibly suffer irreparable harm if preliminary relief were denied, that Schaefer had established sufficiently serious questions to provide fair grounds for litigating the merits of the Clayton Act claim, that the proposed combination of the two competitors in the New York and Philadelphia areas created "a presumption that the purchase would violate the antitrust laws," and that Schaefer had demonstrated that the respective hardships caused by granting or denying preliminary relief tipped decidedly toward it. Accordingly, the court enjoined the execution of the agreement pending a plenary trial and decision on the merits.[4] See Triebwasser & Katz v. A.T.&.T. Co., 535 F.2d 1356 (2d Cir. 1976); Sonesta Int'l Hotels Corp. v. Wellington Associates, 483 F.2d 247 (2d Cir. 1973). Appellants contest several of the factual and legal conclusions reached by the trial court in determining that Schaefer satisfied the criteria for preliminary injunctive relief. We affirm.
 
 
 4
 Schmidt first contends that Schaefer has not made an adequate showing on the merits. We disagree. According to the evidence introduced below, Schmidt's proposed horizontal acquisition of a substantial interest in Schaefer would constitute a prima facie violation of § 7. See United States v. Philadelphia National Bank, 374 U.S. 321, 363, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963). The companies are locked in vigorous competition with each other in the New York and Philadelphia metropolitan areas, where the two have substantial shares of the market, and elsewhere in the northeastern region. In 1977 four brewers (Schaefer, Schmidt, Anheuser-Busch, and Miller) accounted for 81.8% Of all sales of beer to food stores in the New York metropolitan area, with Schaefer and Schmidt making 23% And 24.3% Of such sales respectively, or a total of 47.3%. In the same year the same four brewers sold 75.2% Of the beer supplied to home vendors in the same area, with Schaefer and Schmidt furnishing 20.1% And 15% Respectively, or a total of 35.1%. The trial court also found that the combined sales of the two companies accounted for 28% Of all sales in the same area for on-premises consumption.
 
 
 5
 A similar pattern of concentration exists in the Philadelphia metropolitan area, where the same four brewers had a combined market share of 60.4%, with Schaefer and Schmidt accounting for 33.0% Of the total beer sales in that area in 1977. Moreover, according to data submitted by Schmidt, in 1977 it and Schaefer were the fourth and fifth leading sellers of beer in the 12-state northeastern region of the United States, each with about 8.6% Of the market in which the top six competitors (including Schaefer and Schmidt) accounted for 78.1% Of the sales.
 
 
 6
 The foregoing and other market data in the record indicate clearly that the effect of the acquisition "may be substantially to lessen competition" within the meaning of § 7, which was intended to provide "authority for arresting mergers at a time when the trend to a lessening of competition in a line of commerce was still in its incipiency," Brown Shoe Co. v. United States, 370 U.S. 294, 317, 82 S.Ct. 1502, 1520, 8 L.Ed.2d 510 (1962); United States v. Penn-Olin Chemical Co., 378 U.S. 158, 170-71, 84 S.Ct. 1710, 12 L.Ed.2d 775 (1964). As the Court observed in United States v. Pabst Brewing Co., 384 U.S. 546, 550-52, 86 S.Ct. 1665, 16 L.Ed.2d 765 (1966), there has been an increasing trend toward concentration in the beer industry. Between 1947 and 1974 the number of breweries in the United States has declined from 404 to 58.
 
 
 7
 The trial court defined each of the two large metropolitan areas (New York and Philadelphia) as a relevant geographic market. The record shows that each is treated as a discrete market by the beer industry in general and by Schaefer and Schmidt in particular. Appellants contend that this demarcation is too narrow and that the relevant market is properly defined as the 12-state northeastern region encompassed within economic shipping distance from the breweries of Schaefer and Schmidt, since this is the complete area in which the two companies compete. Again we must disagree. As the Supreme Court stated in Brown Shoe Co. v. United States, supra, after noting that Congress, in enacting § 7, was "concern(ed) with the protection of Competition, not Competitors," 370 U.S. at 320, 82 S.Ct. at 1521 (emphasis in original), the geographic market must " 'correspond to the commercial realities' " and " may be as small as a single metropolitan area." 370 U.S. at 336-37, 82 S.Ct. at 1530. Later, in Philadelphia National Bank, supra, the Court further observed that "the appropriate 'section of the country' " for purposes of § 7 analysis, "is not where the parties to the merger do business or even where they compete, but where, within the area of competitive overlap, the effect of the merger on competition will be direct and immediate." 374 U.S. at 357, 83 S.Ct. at 1738. See United States v. Bancorporation, Inc., 418 U.S. 602, 619, 94 S.Ct. 2856, 41 L.Ed.2d 978 (1974).
 
 
 8
 Applying these standards, Schaefer has a reasonable basis for claiming that the New York and Philadelphia metropolitan areas are each a relevant "section of the country" and that the effect of the acquisition of the notes "may be substantially to lessen competition" in that market. Moreover, in view of the market shares of the two companies and the competition between them in the 12-state area, Schaefer would have fair grounds for contesting the legality of the acquisition even if appellants' definition of the relevant geographic market were adopted.[5]
 
 
 9
 Appellants next maintain that Schmidt's proposed acquisition of the Schaefer securities falls within the "failing company"[6] or the "non-competitor"[7] exceptions to § 7, a claim usually raised on behalf of the allegedly moribund candidate for acquisition in support of the proposed takeover rather than by the acquiring company. There is no doubt that Schaefer has suffered declining sales and large losses in recent years, although some of the losses are attributable to extraordinary items, such as the closing of an obsolete brewery and the write-off of a large dollar figure attributed to good will, which will not recur. In the past year or so, however, Schaefer has undertaken a number of measures recommended by consultants to rehabilitate the company, the most important of which has been the consolidation of production in its large, modern, and efficient Lehigh Valley brewery. Schaefer also appears to enjoy the continued support of its creditors who have apparently agreed to a restructuring of its long term debt, reducing and deferring interest payments for some years.
 
 
 10
 Although Schaefer's ability to surmount its present difficulties and reverse its sagging fortunes is not foreordained, Schmidt has not shown that Schaefer's "resources (are) so depleted and the prospect of rehabilitation (is) so remote that it face(s) the grave probability of a business failure," which it must do in order to avail itself of the failing company defense to § 7. International Shoe Co. v. FTC, 280 U.S. 291, 302, 50 S.Ct. 89, 93, 74 L.Ed. 431 (1930); United States v. General Dynamics Corp., 415 U.S. 486, 507, 94 S.Ct. 1186, 39 L.Ed.2d 530 (1974). Nor does Schmidt's claim that the acquisition is valid under the General Dynamics exception, a cousin to the failing company defense, deny Schaefer fair grounds for contesting the legality of the purchase of the securities. We need not decide whether the theory developed in General Dynamics that an ostensible competitor which is not a failing company may nonetheless offer such ineffective competition as to preclude the acquisition from violating § 7 applies when the acquired company is alleged to be a competitive cipher solely because of financial infirmities. See United States v. International Harvester Co., 564 F.2d 769 (7th Cir. 1977). Here, all the evidence suggests that Schaefer competes vigorously against Schmidt and other brewers.
 
 
 11
 We turn next to appellants' contentions that the trial court erroneously found that Schaefer would suffer irreparable harm if preliminary relief were denied and that it erroneously weighed the respective hardships. Whether or not Schmidt's acquisition of a 29% Interest in Schaefer will give it control of Schaefer although it is difficult to believe that Schmidt invested in Schaefer without the hope of obtaining control at some point the acquisition would most likely give Schmidt the power to designate one or more members of Schaefer's board of directors.[8] Through such designees, Schmidt would have access to the confidential trade information of one of its leading competitors, including its marketing, pricing, advertising, and new product plans, and could possibly steer Schaefer in a direction that would favor Schmidt's interests at the expense of Schaefer. See Hamilton Watch Co. v. Benrus Watch Co., 114 F.Supp. 307, 314 (D.Conn.), Affd., 206 F.2d 738 (2d Cir. 1953).
 
 
 12
 In addition there would be the risk of decreased organizational morale among Schaefer executives, unsure whether the fruits of their efforts would be siphoned to Schmidt, and among Schaefer's sales personnel and wholesalers, who might forsake it for other brands rather than face the prospect that a Schmidt takeover would result in their being supplanted by its wholesalers. Lastly, Schmidt's own licensing difficulties, arising out of the conduct of its chief executive, could conceivably raise new problems for Schaefer.
 
 
 13
 This case is clearly distinguishable from Kennecott Copper Corp. v. Curtiss-Wright Corp., 584 F.2d 1195 (2d Cir. 1978), relied upon by Schmidt, where an interim breach of confidence or conflict of interest could be avoided by excusing from board meetings the challenged company's designees whenever such problems might arise. In Kennecott the company making the § 7 claim failed to present any actual evidence that it had trade secrets to be kept from competitors. Moreover, the § 7 claim rested upon competition between two subsidiaries, each of which was but a minor part of its parent's conglomerate operations. See 584 F.2d at 1205. In contrast, the competitive overlap between the two firms in the present case is all-inclusive. Schmidt's nominees on Schaefer's board would be unable to perform their duties if they were excused whenever a matter arose presenting a potential conflict of interest, since this situation would exist most of the time. Similarly, this case differs markedly from Missouri Portland Cement Co. v. Cargill, Inc., 498 F.2d 851 (2d Cir.), Cert. denied, 419 U.S. 883, 95 S.Ct. 150, 42 L.Ed.2d 123 (1974), also cited by Schmidt, where the court explicitly noted that the acquiring company had no interest with respect to the acquired company other than the promotion of its welfare, in contrast to the situation presented here, where the two companies are horizontal competitors. 498 F.2d at 869.
 
 
 14
 Denial of preliminary relief in the present case, moreover, could not only expose Schaefer to irreparable injury but also result in harm to the public, whom § 7 was designed to protect, see Gulf & Western Industries, Inc. v. Great Atlantic & Pacific Tea Co., 476 F.2d 687, 698-99 (2d Cir. 1973), since control over Schaefer would obviously give Schmidt the opportunity to eliminate price competition between the two companies, leading to higher prices and profits for them at the expense of a large segment of the beer-drinking public.
 
 
 15
 Against these potential irreparable injuries and hardships associated with denial of preliminary relief, appellants pose the possibility that, if preliminary relief is granted, Schmidt will lose an opportunity to buy and the trustee an opportunity to sell the notes. The contract presently provides that closing may occur any time on or before June 30, 1979. However, it is well within the powers of the contracting parties to extend their self-imposed deadline until a final decision is rendered. Indeed, the parties have indicated that a trial on the merits could be completed within two months, making it possible for a final decision to be reached while the contract is still in effect. In any event, appellants have presented no evidence that this proposed sale, unlike a tender offer, cannot be revived if permanent injunctive relief should be denied. When the prospects of injury to Schaefer or the public if a preliminary injunction should be denied are weighed against the chance that the transaction will abort if such an injunction continues, we agree with the trial court that the balance of hardships tips decidedly toward Schaefer.[9]
 
 
 
 [1]
 F. & M. Schaefer Brewing Co. is a wholly-owned subsidiary of F. & M. Schaefer Corp. The notes and stock which are the subject of this case were issued by the parent. For purposes of this case, there is no need to distinguish between the parent and the subsidiary
 
 
 [2]
 The contract calls for Schmidt to pay the trustee $750,000 by the time of closing and the balance of the purchase price in seven equal annual installments. These installments are non-recourse obligations, secured only by the notes or the shares received upon conversion of the notes
 
 
 [3]
 The notes bear interest at 4% Per annum, but pursuant to an amendment to the notes in December 1973, interest is deferred until Schaefer achieves a level of earnings it has not since attained, and accrued interest over.$1.6 million is permanently waived. The notes, in a trust for members of the Schaefer family, came into being when the family sold the company to the public in 1968
 
 
 [4]
 At the outset of the hearing Schmidt, but not Schaefer, was willing to consolidate the hearing with the plenary trial. At the close, each party had reversed its position; Schaefer, but not Schmidt, was now willing to have the two proceedings consolidated. The trial court declined to consolidate, but observed that it could not imagine what additional evidence might be relevant. Both parties have indicated a desire to introduce some evidence that has become available since the hearing
 
 
 [5]
 Under Department of Justice Merger Guidelines, § 1, P 6, the Government has indicated that it will normally challenge a merger between two competitors each of which has a market share of 5% Or more
 
 
 [6]
 See International Shoe Co. v. FTC, 280 U.S. 291, 50 S.Ct. 89, 74 L.Ed. 431 (1930)
 
 
 [7]
 See United States v. General Dynamics Corp., 415 U.S. 486, 94 S.Ct. 1186, 39 L.Ed.2d 530 (1974)
 
 
 [8]
 Four positions on Schaefer's 10-member board were to be filled at the 1978 shareholders' meeting. The scheduling of that meeting, the setting of the record date, the filing of proxy materials, and the soliciting of proxies were suspended by order of the district court pending our decision on this appeal. Three additional seats were to be filled at the 1979 shareholders meeting. Schaefer does not have cumulative voting
 Schmidt intimated that it was bound by the contract for the sale of the notes to nominate only "independent" directors for membership on Schaefer's board. However, the agreement actually provides only that Schmidt will "use its best efforts" to see that at least one-fifth of Schaefer's board members are independent. One of these independent directors may be Schmidt's own legal counsel.
 
 
 [9]
 Appellants contend that the injunctive order is unnecessarily broad inasmuch as an order simply prohibiting Schmidt from converting the notes into shares or from exercising the voting rights of the shares would fully protect Schaefer and the public during the pendency of a final decision on the merits. Since a prompt resolution of the issues at trial is likely, we see no reason to modify the order
 Appellants also contend that the trial court set the security bond at an inadequate figure $250,000. Under the circumstances of this case we do not view the setting of security in this amount as an abuse of discretion. Ferguson v. Tabah, 288 F.2d 665, 675 (2d Cir. 1961); see generally 7 Moore's Fed.Prac. P 65.09 at 65-94.