STATE OF NEW YORK, Plaintiff,

v.

KRAFT GENERAL FOODS, INC., Nabisco Cereals, Inc., Nabisco, Inc., Philip Morris Companies Inc., RJR Nabisco Holdings Corp., and RJR Nabisco Inc., Defendants.

No. 93 Civ. 811 (KMW).

United States District Court, S.D. New York.

Sept. 12, 1994.

---

Gary Malone, Asst. Atty. Gen. and Oliver Koppell, Atty. Gen., New York City, for plaintiff.

Abe Krash, Arnold & Porter, Washington, DC, for Kraft.

Richard C. Weisberg, Simpson, Thacher & Bartlett, New York City, for Nabisco and RJR Nabisco.

## OPINION AND ORDER

KIMBA M. WOOD, District Judge.

Plaintiff State of New York ("the State") has renewed its motion for a preliminary injunction. For the reasons set forth below, the State's motion is hereby denied.

## BACKGROUND

Much of the background of this antitrust action is set forth in the court's Opinion and Order of June 14, 1993, denying the State's first motion for a preliminary injunction. Familiarity with that opinion is assumed. In short, this case arises from the acquisition by defendant Kraft General Foods, Inc. ("Kraft") of defendant Nabisco Cereals, Inc.'s ("Nabisco") ready-to-eat ("RTE") cereal assets (the "Acquisition"). The State asserts claims under Section 7 of the Clayton Act, 15 U.S.C. § 18, Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and Section 340 of New York's Donnelly Act, N.Y.Gen.Bus.L. § 340. New York ultimately seeks either (1) to rescind the transaction between Kraft and Nabisco and thereby return Nabisco to the

RTE cereal business, or (2) to divest Kraft of Nabisco's assets to another firm that could function in Nabisco's place as the sixth major competitor in the RTE market.

The State appealed the court's June 14, 1993 decision denying its first motion for a preliminary injunction, and in an order dated November 5, 1993, the Court of Appeals affirmed, noting with approval that this court was prepared to reconsider granting a preliminary injunction if the State could more substantially establish a threat of irreparable harm. 14 F.3d 590. On January 19, 1994, after substantial discovery, the State renewed its request for a preliminary injunction with the instant motion. In February and April, the court conducted evidentiary hearings on the instant motion.[1] The State seeks a preliminary injunction prohibiting defendants from taking any action that would impair the commercial value and marketability of the Nabisco RTE cereal assets. More specifically, the State seeks to restrain Kraft from taking any action that would have the effect of merging the "Nabisco Shredded Wheat" brand equity and identity associated with the acquired Nabisco RTE cereal products into its own "Post" line of RTE cereal products. The State claims that such a merger would eliminate the independent "Nabisco Shredded Wheat" brand identity and dissipate brand equity associated with the Nabisco brand. At this juncture, the court considers Kraft's transition plans (1) to reduce the size of the Nabisco triangle, to place the Post logo near the Nabisco logo on the front of the cereal package, and to place on the back of the package a "Dear User" letter explaining the transition; (2) otherwise to associate the Nabisco RTE cereal assets with Post through advertising and pro-

motions; and (3) to discontinue Nabisco's marginal cereal brands.

## DISCUSSION

### I. *Legal standard.*

■ The State of New York sues as *parens patriae* on behalf of the citizens of New York. Although the State of New York is a governmental actor, it is considered a private party when seeking an injunction pursuant to the Clayton Act. *See California v. American Stores Co.*, 495 U.S. 271, 296, 110 S.Ct. 1853, 1867, 109 L.Ed.2d 240 (1990). The State, therefore, does not benefit from the presumption of irreparable harm enjoyed by the Federal Trade Commission or the Department of Justice when those agencies sue to stop a merger. *See FTC v. University Health, Inc.*, 938 F.2d 1206, 1218 (11th Cir. 1991). Thus, to obtain preliminary injunctive relief, the State must establish "(1) irreparable harm *and* (2) either (a) likelihood of success on the merits *or* (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Consolidated Gold Fields, PLC v. Minorco, S.A.*, 871 F.2d 252, 256 (2d Cir.1989) (citation omitted) (emphasis added). Section 16 of the Clayton Act, 15 U.S.C. § 26, requires the State to make "a showing that the danger of irreparable loss or damage is immediate." In affirming this court's decision on the State's initial preliminary injunction motion, the Court of Appeals noted that to obtain the relief sought here, the State "must demonstrate a real and genuine threat of irreparable harm." *New York v. Kraft General Foods, Inc.*, 93 Civ. 7691, slip. op. at 3 (Nov.

---

1. At the close of the hearings, there remained an open question regarding the admissibility of defense exhibits 6, 9, 10, 13, and 16. In a phone conference on June 15, 1994, I indicated that I was inclined to admit these exhibits under Rule 803(24) of the Federal Rules of Evidence, unless the State could demonstrate some reason to believe that the data contained in these exhibits is unreliable. Tr. of June 15, 1994 Conference Call, at 4. In a letter to the court dated June 24, 1994, the State withdrew its objections to defense exhibits 6 and 10, but reasserted its objections to the remaining three exhibits. More specifically, the State complains that (1) Kraft failed to give adequate notice of its intention to rely on Rule 803(24) for admissibility of this evidence; (2) the evidence is untrustworthy in that it was generated for purposes of litigation, and is inconsistent with certain Kraft business documents; (3) the exhibits are not more probative on the point for which they are offered than any other reasonably available evidence; and (4) the exhibits have not been adequately authenticated. Because I do not consider this evidence necessary for resolution of the preliminary injunction motion, I will exclude this evidence at this time, subject to reconsideration if necessary at trial.

5, 1993). Applying the foregoing standard to this case, the court finds a preliminary injunction unwarranted.

II. *Application of the standard for a preliminary injunction.*

The parties agree that the central issue on this renewed motion is whether the Post–Nabisco transition will irreparably harm the competitive viability of Nabisco RTE cereal assets in the event that the court eventually orders rescission or divestiture. State's Post-hearing Reply, at 4; Kraft's Post-hearing Memorandum, at 4. The centerpiece of the Nabisco RTE cereal assets is the goodwill associated with the Nabisco mark, for which Kraft paid three-quarters of the total $450 million acquisition price. The primary question with respect to irreparable harm, therefore, is whether the planned Post–Nabisco transition would irreparably erode that goodwill such that it could not be regained by Nabisco or a new entrant ("Newco") upon rescission or divestiture.[2]

The parties agree that the Nabisco mark is strongly associated with shredded wheat products, giving the mark what is known as "brand equity." The parties disagree, however, over what implication the existence of this brand equity has for disposition of the instant motion. The State argues that the brand equity would be essential to the competitive viability of Newco or Nabisco, were the court to order rescission or divestiture. The State claims that the planned transition would erode the Nabisco brand equity and/or transfer some of it to Post. To make possible an effective final remedy, the State urges the court to preserve Nabisco's independent brand equity for possible final transfer to Newco or back to Nabisco. In opposition, Kraft asserts that the Nabisco brand recognition with respect to Shredded Wheat is so strong that there is little danger that the

strength would be eroded as a result of being paired with the Post mark during the pendency of this litigation.

The State posits five consequences of the transition that could weaken the competitive viability of the Nabisco RTE cereal assets: (1) the transition would eliminate the independent identity of the Nabisco brand; (2) the transition threatens to eliminate Nabisco's brand dominance with respect to Shredded Wheat; (3) the transition would weaken consumers' strong positive associations with Nabisco Shredded Wheat; (4) Kraft will appropriate at least some of the Nabisco goodwill; and (5) Kraft will discontinue Nabisco's small brands. State of New York's Post–Hearing Memorandum, at 4. The State claims that these arguments constitute "five separate grounds" for a finding of irreparable harm. The distinctions between some of these points are elusive, however, and much of the same evidence is cited in support of the State's different theories. I find that the evidence may be more clearly categorized in terms of three relatively distinct theories of harm to Nabisco's competitive viability: (1) the transition will taint Nabisco's brand identity; (2) the transition will undermine the independence of Nabisco's brand identity; and (3) the transition may result in discontinuation of Nabisco's small brands. These theories of harm are discussed in turn below.

A. The Risk of Tainting the Nabisco Mark.

■ In connection with the first preliminary injunction motion, I concluded that there was little evidence that the Post mark elicits negative feelings in consumers such that its association with Nabisco products will taint those products. *See* Opinion & Order, at 10 & n. 5. In support of its argument that the Post transition would

---

**2.** During the hearings on this motion, there was substantial discussion regarding whether Newco would have the right to use the Nabisco logo upon divestiture. *See* Tr. at 875 *et seq.* Neither side would have the court resolve this thorny question at this time. The State urges the court to assume that it can fashion effective relief, including any order necessary to enable Newco to use the Nabisco logo. *See* State's Post–Hearing Mem. at 52. Kraft, on the other hand, urges

the court merely to conclude that plaintiff's theories regarding the future status of the Nabisco logo are too conjectural to support a finding of irreparable harm. *See* Kraft's Post–Hearing Mem. at 8. Without having drawn any conclusions on the question, the court assumes, *arguendo,* solely for purposes of this motion, that it will be able to fashion relief that will enable the ultimate holder of the Nabisco assets to be a viable competitor in the RTE cereal market.

harm or distort Nabisco's image, the State relies primarily on new evidence obtained in discovery, namely three studies conducted by or for Kraft: (1) a 1990 marketing analysis of Post's overall packaging format; (2) a concept test or consumer survey conducted as part of Kraft's effort to relaunch Nabisco Frosted Wheat Squares as a Post product; and (3) a focus group study of consumer reactions to alternative Post packaging for the Nabisco shredded wheat line. On the basis of these studies, the State's expert, Professor Herr, testified that Kraft itself considers the Post mark a liability. *See* January 18, 1994 Herr Aff., at ¶¶ 27–31, 34, 37–46, 48, 50–2, 54, 56–63, 65–7. For the reasons set forth below, I find his analysis unpersuasive.

Professor Herr cites the marketing analysis, conducted by SBG Partners in 1990, as indicating that " 'the Post image is neutral to negative,' " "the Post image handicapped Post's ability to compete in significant ways, including contributing to a perceived lack of quality," and "the Post brand identity is 'skewed to Kid' cereals." January 18, 1994 Herr Aff., at ¶¶ 28, 30–1, 37. Based on the SBG Partners study, Kraft adopted a Post Packaging System Guidelines Manual, which, according to Professor Herr, confirms that the Post trademark is considered a liability in the adult cereals such as Post Grape Nuts.

Professor Herr's testimony takes the SBG Partners study and Post Packaging Manual out of context. Although critical of Post's traditional packaging, the SBG Partners study indicates that the analysts merely considered the Post mark an underutilized asset, not a liability. Contrary to the inferences drawn by Professor Herr, among the suggestions for improvements made by Kraft management and affirmed by SBG Partners was that Kraft leverage the Post trademark. January 28, 1994 Assael Aff., Ex. F., at 2, 41 (hereinafter "SBG Partners Study"); *see also* Tr. at 19–21. Moreover, the study noted that although Post is third in sales among RTE cereal producers (behind Kellogg and General Mills), its trademark is second only to Kellogg. *See* SBG Partners Study, at 2. SBG Partners found the Post mark inferior to the Kellogg mark, but they concluded that

Post's image "would not seriously detract from Post brands in their ability to compete with General Mills brands. The Post brand mark will support new products at least as effectively as does Big G." *Id.* at 26. SBG Partners noted that Post is associated with reliability, integrity, and natural, healthy, adult cereals—the same positive characteristics that the State fears Nabisco will lose when co-branded with Post. *See id.* at 18–19, 25, 28. To the extent that the SBG Partners study and the Post Packaging Manual suggest that Kraft downplay the Post mark on Grape Nuts packaging, that recommendation is made simply out of deference to the strong Grape Nuts brand equity, *see* January 18, 1994 Herr Aff., at ¶ 34; *see also* Tr. at 21; it does not support the further conclusion that the Post logo is necessarily a liability in the adult cereal market. *See* Tr. at 24. Professor Herr points out that SBG Partners expressed a concern that Post's identification with some "kids' products" could result in a negative backlash against its more nutritious products. Professor Herr neglects to note the study's related conclusion, however, that linkage of Post's more nutritious products with "kids' products" could broaden the mark's "all family appeal." SBG Partners Study, at 39; *see also* Tr. at 8–11. In sum, I find Professor Herr's reading of the SBG Partners study and Post Packaging Manual one-sided and unpersuasive. Moreover, I note that the SBG Partner's study is over four years old and that it was conducted at a time when Post sales had been falling. *See* Kirban Aff., at ¶ 35. Since that time, Post has been the fastest growing branded RTE cereal company in the market, *id.*, perhaps in part because it has taken to heart the lessons learned in the SBG Study. In any event, the four-year-old study cannot form the basis for an accurate prediction of the effect of the currently proposed transition. *See* Tr. at 31–2. For the foregoing reasons, I conclude that the study does not constitute evidence of irreparable harm sufficient to support a preliminary injunction.

As noted above, in support of its argument that association with Post will taint the Nabisco mark, the State also points to two more recent Kraft studies: a concept study regarding the relaunch of Nabisco Frosted

Wheat Squares, and a focus group study regarding the Post–Nabisco transition packaging. Neither of these two studies, considered separately or together in combination with the SBG Partners study discussed above, constitutes convincing evidence of a real and genuine threat of irreparably undermining the positive attributes associated with the Nabisco mark. The concept study sought consumer views on a frosted wheat squares product under the Nabisco, Kellogg, and Post marks. Sixty-five percent of respondents stated that they would definitely or probably buy Nabisco Frosted Wheat Squares, 54% said they would definitely or probably buy Kellogg's Frosted Mini–Wheats, and 53% said they would definitely or probably buy Post Frosted Wheat Squares. *See* January 18, 1994 Herr Aff., at ¶ 44. Likewise, 13% said they would not buy the Post product, 8% said they would not buy the Kellogg product, and 7% said they would not buy the Nabisco product. *Id.* The concept test data are statistically significant only with respect to the number of respondents who indicated they would buy the Nabisco product as compared to the number who indicated they would buy the Post product. *See* Kirban Aff. at ¶ 40(d); Tr. at 341–42 (difference between respondents who indicated they would not buy Nabisco product and those who would not buy Post product is not statistically significant); *see also* Tr. at 39 (difference between respondents who indicated that they would buy Kellogg's and those who indicated that they would buy Post is not statistically significant). Moreover, the test design put Post at a significant disadvantage, given that Post was the only company in the test that did not already have a shredded wheat product on the market. *See* Tr. at 35, 229. Considering the enormous success of Kellogg's Frosted Mini–Wheats and the strong equity of the Nabisco trademark in the shredded wheat market, Post's performance in the study suggests that it actually has remarkable acceptability in the shredded wheat market. *See* Assael Aff., at ¶ 33; *see also* Tr. at 363–66, 385.

The third study the State relies on— Kraft's 1993 focus group study regarding transition packaging—is equally unpersuasive. The study analyzes focus group responses to various Post–Nabisco packaging alternatives. The State points to statements by focus group members expressing feelings of confusion and alienation in response to the addition of the Post mark to the Nabisco box. January 18, 1994 Herr Aff., at ¶¶ 57–61. Professor Herr testified that these reactions to the proposed transition suggest that the transition threatens to undermine Nabisco's image as the trusted manufacturer of the original shredded wheat, and thereby erode its competitive viability. *Id.* at ¶¶ 65–7. The focus group tests furnish inadequate support for that conclusion. First, such studies are designed to provide qualitative, not quantitative insights. *See* Kirban Aff., at ¶¶ 44–5; *see also* Tr. at 67, 84. Significantly, Kraft uses such data to fine tune its marketing efforts, not to direct them. Leckie Aff., at ¶ 9; Tr. at 679–70. Second, the focus groups used here were comprised exclusively of heavy users of Nabisco Shredded Wheat. Kirban Aff., at ¶ 48. Heavy users of Shredded Wheat are responsible for purchasing 70% of the Shredded Wheat consumed annually,[3] but their reaction to the addition of the Post mark to Nabisco cereal boxes is likely to be unrepresentatively negative. Kirban Aff., at ¶¶ 52–3. Finally, even though these heavy users did express some negative feelings about the addition of the Post mark, their concerns were substantially allayed by the "Dear User" letter that Post intends to place on the Post–Nabisco boxes. Kirban Aff., at ¶ 58. Having considered the focus group study, the SBG Partners marketing analysis, and the concept test, as well as the Consumer Reports ratings and other Kraft business documents, I am not persuaded that addition of the Post mark threatens irreparable harm to Nabisco's RTE cereal image.

This conclusion is reinforced by several important factors. First, Post is a well-known and respected mark in the RTE cereal industry, although not as strong in the shredded wheat sub-market. Indeed, adding the Post mark could even enhance Nabisco's brand equity by attracting new consumers. Kirban Aff. ¶¶ 23, 24; Tr. at 434, 709, 837–38,

---

**3.** February 4, 1994 Aff. of Professor Herr, at ¶ 22.

850–51, 1016, 1114. Second, Kraft, which seeks to increase the market share and sales of its new assets, has an incentive to strengthen Nabisco's brand equity rather than weaken it; any purpose counter to this would be self-defeating. Assael Aff. ¶¶ 39, 53, 55, 57, 68; Kirban Aff. ¶¶ 14, 27; Leckie Aff. ¶ 36. Consistent with this intention, Kraft has significantly raised expenditures on advertising and promotion for the Nabisco RTE cereal products while using the Nabisco name. Leckie Aff. ¶¶ 37–9; Tr. at 773–76. Since acquiring the Nabisco RTE cereal assets, Post has probably increased Nabisco's brand equity, as evidenced by the increases in sales and market share in 1993. Leckie Aff. ¶¶ 40–1; Tr. at 1016–17, 1046. Third, I note that the managers of the Nabisco trademark agreed to the association with Post, including the proposed packaging change at issue here. *See* Hartman Aff., at ¶¶ 4–5. Nabisco remains active in the cookies and crackers business, and presumably, its managers would not have approved the proposed packaging designs if they considered them injurious to Nabisco's image. Assael Aff. ¶ 58; Hartman Aff. ¶¶ 7, 9; Tr. at 293–95, 307–310.

Finally, even if a brand merger with Post would weaken consumers' positive feelings about Nabisco Shredded Wheat, Professor Herr testified on behalf of the State that there is no way of knowing when this effect might occur, and that it might occur only slowly over time. *See* Tr. at 50–4. Counsel for Kraft has repeatedly represented to the court that it will take at least four to five months for Kraft to put the new packaging on supermarket shelves. *See also* Leckie Aff., at ¶ 14 ("once a new package design for the former Nabisco products is approved it will take from 23 to 25 weeks and cost approximately $625,000 before the packaging appears on supermarket shelves"); Tr. at 693.[4] A firm trial date of September 27, 1994 has been set in this case, and the court expects to issue a decision by the end of October. In light of this timeline, the threat of irreparable harm through association with any negative aspects of Post's image is de minimis. On the basis of the foregoing, I find that there is an insufficient threat that the Nabisco mark will be irreparably tainted by the proposed transition to warrant a preliminary injunction.

### B. The Risk of Undermining the Independence of the Nabisco Mark.

Upon the State's first motion for a preliminary injunction, I found too speculative the State's contention that the addition of the Post name to Nabisco packaging would cause irreparable harm. In affirming that decision, the Court of Appeals noted the importance of considering the effect of a brand merger on the independence of the Nabisco mark. On this renewed motion I have focussed separately on the independence of the Nabisco mark, as well as the effect on its image. I have concluded that there is insufficient evidence of a real and genuine threat that the transition will irreparably erode the independent value of the Nabisco mark such that the transition would preclude effective final relief.

In support of its claim that the transition threatens the independence of the Nabisco mark, the State points to Kraft business documents, including the focus group study discussed *supra*, indicating that Kraft itself has identified a concern that the brand transition could confuse and alienate Nabisco consumers. The State also points to the testimony of Kraft witnesses to the effect that the purpose of the proposed transition is to persuade consumers to associate the formerly Nabisco products with Post. The State claims that if Post is allowed to appropriate the Nabisco goodwill in this fashion, were the court to order a subsequent rescission or divestiture, Nabisco or Newco would be a less viable competitor against Post and the other RTE cereal manufacturers.

These concerns do not warrant a preliminary injunction here. I note once again that this case will be finally resolved at the district court level within three months. Both sides agree that the Nabisco brand equity is

---

4. Indeed, during the hearings, counsel for Kraft suggested that depending on the timing of this decision and trial, Kraft might not even begin implementation of an expensive transition until after final disposition of the case. *See* Tr. at 273.

remarkably strong. With respect to shredded wheat, the State attributes "brand dominance" to the Nabisco mark, i.e., consumers associate only Nabisco with shredded wheat. *See* State's Post Hearing Mem. at 1. Although the Post–Nabisco transition may eventually result in some erosion of the independent identity of the Nabisco mark, I do not think that the transition threatens such an effect over the course of the next three months.

A number of facts inform this conclusion. First, I note that in negotiating the transaction with Nabisco, Kraft itself determined that it would take three to four years to transfer the Nabisco goodwill to Post, and therefore purchased a four-year license on the Nabisco mark. *See* Leckie Aff., at ¶ 7; Tr. at 696. I find this to be persuasive evidence of the length of time it would take to undermine the independence of the Nabisco mark.

Second, I credit Dr. Assael's testimony to the effect that generally speaking, the process by which consumers forget strong brand associations is a gradual one. *See* Assael Aff., at ¶¶ 37, 59; Tr. at 1015, 1024–27, 1037–38; *see also* Kirban Aff., at ¶¶ 18–9, 25; Leckie Aff., at ¶ 12; *cf.* Tr. at 189 (Prof. Herr indicating that there would be greater threat to "top-of-mind" brand than to "dominant" brand). I find this analysis more convincing than the speculative assertions of Professors Herr and Cotterill that the transition will result in immediate weakening of Nabisco's independent identity, and in turn, its competitive viability. *See* Tr. at 131, 136, 156, 236, 325–26, 415, 423–24, 427, 443.

Third, I note that Kraft may be contemplating more than one phase to its transition. *See* Leckie Aff. at ¶¶ 10, 22; Tr. at 482. *But see* Tr. at 702–04. At least during the currently proposed initial phase, the packaging will be substantially similar to the current Nabisco packaging, reducing slightly the size of the Nabisco triangle and adding only the "Brought to You by Post" message, the Post mark, and the "Dear User" letter. *See* Kirban Aff., at ¶ 25(b); Tr. at 855. The Nabisco products will remain in their familiar bright yellow and bright red packaging, and they will still be labelled with the "Nabisco" brand in bold lettering. *See* Tr. at 855. This packaging change, even if it were initiated now, would not appear on grocery shelves until at least four to five months from now, after a district court decision on the merits. *See* Leckie Aff. at ¶ 14; Tr. at 693. In addition, I have concluded that this initial phase, were it to be implemented more rapidly, would not pose a real and genuine threat of undermining the independent identity of the Nabisco mark in the RTE cereal market.[5] *See* Tr. at 817–18, 855, 949–50, 952, 968–69, 989–90, 1015, 1024–27. A subsequent phase in which Kraft seeks more aggressively to subordinate the Nabisco mark to the Post mark might be more threatening. *See* Kirban Aff., at ¶¶ 59–60; Leckie Aff., at ¶¶ 6–7. As Mr. Kirban points out, "[v]irtually all of the individual negative comments quoted by Professor Herr from the focus groups participants were reactions to package designs intended to explore possible *later* phases of the trademark transition, where the Post logo dominated the Nabisco logo in size and prominence or the Nabisco logo was eliminated altogether." Kirban Aff., at ¶ 60. Significantly, I will have an opportunity to reach final conclusions on the merits of the case long before Kraft moves into the later phases of its transition.[6]

Finally, the State urges me to assume that I will be able to fashion effective relief, in-

---

5. Significantly, the packaging currently proposed is different from that previously considered and approved by this court and the Court of Appeals. The packaging previously proposed labelled the Nabisco cereals as "Made By Post." The current proposed package would be labelled as "Brought to you by Post." I agree with Mr. Leckie that the new proposal is more subtle than the previous proposal in that it presents a looser association between Post and Nabisco. *See* Leckie Aff., at ¶ 18; *see also* Tr. at 111–12, 416, 700–02. I find this new packaging less threatening to the independence of the Nabisco mark than that I previously considered.

6. Mr. Leckie has testified that Kraft intends to use the proposed packaging through the end of 1995. In the event that prior to final disposition of this case at the district court level Kraft contemplates the use of packaging other than that currently before the court, Kraft shall inform the State and the Court, and the State shall have leave to renew the instant motion with respect to the newly proposed packaging.

cluding an arrangement whereby the ultimate holder of the Nabisco cereal assets will be allowed to use the Nabisco trademark for a period of time before it implements its own transition. *See* State's Post–Hearing Mem., at 52; *see also supra* note 2. Although I do not decide now that such a remedy *can* be ordered, I note that such a remedy would enable Newco to counteract the limited damage to Nabisco's independent identity that may result from the transition. *See* Tr. at 706.

In sum, I conclude that the evidence does not support a finding of a real and genuine threat to the independence of the Nabisco mark. Decisional law cited by the State is not to the contrary. First, the State cites several trademark infringement and unfair competition decisions. Although the posture of this case focuses the court's attention on the effect of the transition on the independent viability of the Nabisco trademark, it must be remembered that this is an antitrust case. In the trademark infringement decisions cited by the State, the courts granted injunctions to serve different statutory purposes than those at issue here. Although I find these decisions instructive as to the kinds of product packaging or other business practices that are generally deemed confusing to consumers or unfair to competitors, I do not find these decisions dispositive of when such activities threaten an irreparable antitrust injury.

In addition to these trademark cases, the State cites a number of Section 7 cases, each of which presents a more substantial threat of harm than that shown here. In *Consolidated Gold Fields PLC*, 871 F.2d 252, the Court of Appeals affirmed a preliminary injunction preventing a merger that would have resulted in the defendant eliminating its viable competitors and dominating the world gold market. Although some of the language in that decision may support the State's position, this case does not present a comparable threat of antitrust injury. First, even were I to find that the transition poses a threat to the Nabisco brand equity, there is no basis for concluding that it threatens to eliminate a viable competitor. Second, the *Consolidated Gold Fields* injunction was entered prior to a takeover. By contrast, in this case, in which

the transaction has already been consummated, it is substantially less important to preserve the status quo and otherwise avoid "scrambling the eggs." *Grumman Corp v. LTV Corp.*, 665 F.2d 10 (2d Cir.1981) and *F. & M. Schaefer Corp. v. C. Schmidt & Sons Inc.*, 597 F.2d 814 (2d Cir.1979) are equally distinguishable. Both cases involved pre-transaction injunctions and raised concerns not present here, including the threat of disclosure of confidential trade information and disruption of the business. In sum, neither the decisional law cited to me nor the evidentiary record before me indicates that this case presents a threat of irreparable harm to the independence of the Nabisco mark.

C. Threat of Discontinuation of Smaller Nabisco Products.

■ Among the bases for a finding of irreparable harm advanced by the State is its concern that Kraft plans to discontinue Nabisco's smaller cereal brands, Team Flakes and Fruit Wheats. The State urges the court to preserve these Nabisco assets so that upon rescission or divestiture Nabisco or Newco could cannibalize these assets themselves, or use them as a broader platform from which to expand and compete. *See* State's Post–Hearing Mem. at 28–9; State's Post–Hearing Reply Mem. at 22–4.

I previously addressed this issue in a July 29, 1993 Opinion and Order denying the State's motion for an injunction pending appeal. In that decision, I concluded that "[t]he value of the Nabisco RTE cereals is best preserved by permitting Kraft to pursue a marketing strategy that maximizes the sale of Nabisco RTE cereals generally, rather than by forcing Kraft to continue to promote. and sell unpopular brands solely to preserve the possibility of transferring to a new entrant the Nabisco RTE cereal business exactly as it existed on November 12, 1992—a goal that is probably unachievable in any event in the rapidly changing RTE cereal market." Opinion and Order, July 29, 1993, at 8.

To the extent that Kraft intends to use the assets connected with Nabisco's marginal brands to produce and market Nabisco's more successful brands, my conclusion remains the same. However, in renewing its motion for a preliminary injunction, the State points to Kraft business documents suggest-

ing that Kraft intends to discontinue the marginal Nabisco brands to the advantage of other Post brands, as opposed to other Nabisco brands. *See* Tr. at 515–16, 605. Although this evidence raises new concerns, I find insufficient evidence of a threat of irreparable harm to enjoin Kraft at this time. First, I note that the Nabisco brands at issue here represent a very small share of the RTE cereal market. Elimination of these brands, including the shelf space that is associated with them, would not substantially affect the overall competitive viability of the Nabisco RTE cereal assets. In this regard, I find this case distinguishable from *Grumman*, in which liquidation of substantial assets was contemplated. *See Grumman Corp. v. LTV Corp.*, 527 F.Supp. 86, 101–02 (E.D.N.Y.), *aff'd* 665 F.2d 10 (2d Cir.1981). Moreover, I believe that the market has made a judgment with respect to these marginal brands that would apply regardless of whether they were being managed by Kraft, Nabisco, or Newco. *See* Tr. at 747–61. To the extent that Kraft's elimination of these brands shifts Nabisco manufacturing facilities to the production and promotion of Post products, *see* Tr. at 515–16, I believe that it is within my power to restore these assets in the event I eventually order rescission or divestiture.[7] I conclude therefore that any elimination of the marginal Nabisco brands that may occur during the next three months does not threaten irreparable harm sufficient to warrant a preliminary injunction.

### CONCLUSION

For the foregoing reasons, I conclude that the State has failed to meet its burden to prove that the proposed transition represents a real and genuine threat of irreparable harm. In light of this conclusion, I do not reach questions relating to the merits of the underlying dispute. I hereby deny the State's renewed motion for a preliminary injunction.

SO ORDERED.

---

**7.** In this regard, I note that the State has urged me to assume, for purposes of this motion, that I have broad powers to fashion effective relief. *See* State's Post–Hearing Reply Br., at 34–5.